UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ELOHIM EPF USA, INC.,

               Plaintiff,

       -against-

162 D & Y CORP. d/b/a Flower Karaoke, DONG
HYUN HA, MANHATTAN ZILLER ZILLER,
INC. d/b/a K2 Karaoke, Y & P BAYSIDE CORP.
d/b/a Happy Karaoke, PHIL SOOK CHO, SING
SING BELL, INC. d/b/a Christmas Karaoke, JIN
E. AN, MUSIC BOX KTV, INC. d/b/a Music
Box K-TV, ANTHONY KIM, M & S MUSIC
STUDIO, INC. d/b/a Gagopa Karaoke, HYE
KYUNG HAN, SS NOBLESS HOUSE, INC.
d/b/a Noblesse House, YINHUA HUANG,
PLACE OF HAPPY & LUCKY INC. d/b/a The
King Karaoke, GUNHA SONG, NORAE
HAHNUN JIB CORP. d/b/a Open Karaoke,
BIZMAX NY, INC. d/b/a WOW Karaoke, LI
BEOM KIM, HARMONY KARAOKE KTV,
INC. d/b/a Harmony Karaoke, JOSEPH N.
ZOINO, SWEETIE & VIP, INC. d/b/a I Luv
Luxury Room, YS2 ENTERPRISES, INC. d/b/a
CEO Business Club, HYUAN HAK YI, EUNSIK
SUN, GS GLOBAL CORP d/b/a Red, DAVID
RHEE, SOMETHING 1, INC. d/b/a Something,
SUNNY TAE KIM, SAGWA NAMOO, INC.
d/b/a Sagwa Namoo, KYUNG SOON NAM,
TOMATO 162, INC. d/b/a Tomato Karaoke
Room, SUNG LAW KIM, OPEN KARAOKE
CORP. d/b/a Open Karaoke, KU HO YOU,
DONG HUN KIM, BASE KARAOKE, INC.
d/b/a Base Karaoke, NEW MANHATTAN
ZILLER ZILLER, INC. d/b/a Base Karaoke,

               Defendants.

-------------------------------------------------------------x

19-cv-2431 (PKC) (SDA)

OPINION AND ORDER
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

CASTEL, U.S.D.J.,

These Findings of Fact and Conclusions of Law decide claims of copyright infringement that were tried to the Court on July 14, 17 and 18, 2023.  See Rule 52(a)(1), Fed. R. Civ. P.  Plaintiff Elohim EPF USA, Inc. ("Elohim") asserts that it has valid copyrights for seven Korean-language songs that were allegedly displayed and performed in the defendants' karaoke establishments located in Manhattan and Queens.  In the style of karaoke bars popular in Korea, the defendant establishments offer "private" karaoke rooms to members of the public, who pay either fixed or hourly rates to access the rooms and sing karaoke with the other members of their parties.  These karaoke rooms contain a karaoke machine and a songbook that customers use to select and perform the songs with the aid of lyrics displayed on a video screen.  Customers may order food and drinks from employees who freely enter and exit the individual rooms.

Elohim asserts that defendants violated the Copyright Act by infringing its exclusive performance and display rights in the seven disputed songs.  17 U.S.C. § 106.  As will be explained, the Court concludes that defendants have not rebutted the presumption of validity in Elohim's certificates of copyright registration.  The Court also concludes that the performance of karaoke in nominally "private" rooms constituted public performances under the Copyright Act because the defendant establishments are open to the public, hold themselves out as karaoke establishments and do not afford meaningful privacy to their customers.  The Court concludes that Elohim has proved that defendants infringed its exclusive performance and display rights over the seven works.

Elohim seeks statutory damages for willful infringement from each defendant in the maximum available amount of $150,000 per infringed work.  The evidence falls far short of demonstrating willful infringement by any defendant.  Elohim has not otherwise addressed the

factors relevant to an award of statutory damages.  The Court concludes that statutory damages from each defendant in the amount of $3,500 per infringed work adequately advances the statute's goals of deterrence and compensation.  The Court also concludes that applying Second Circuit authority to the record in this case, only a single award of statutory damages may be given for the multiple works registered by Elohim as a "single work."  Damages will be awarded to Elohim in the aggregate, total amount of $108,500.

## FINDINGS OF FACT

1.      Elohim asserts that the defendant karaoke establishments have infringed its registered copyrights for seven musical compositions: "So Cool," "Push Push," "Sal Man Jji Go," "Ni Kka Jit Ge," "Ga Sik Geol," "Bae A Pa" and "Hot Boy."  (JPTO at 4 (ECF 287).). In its post-trial submissions, Elohim also uses English titles for certain works, referring to "Sal Man Jji Go" as "Is It Popping," "Ni Kka Jit Ge" as "How Dare You," Ga Sik Geol" as "Shady Girl," and "Bae A Pa" as "Jealousy."  (ECF 361, 362.)  The Court will refer to all seven compositions collectively as the "Disputed Works."

2.      The seven Disputed Works were narrowed from a larger number of compositions previously claimed by Elohim.  The Second Amended Complaint asserted that defendants infringed Elohim's registered copyrights for 25 songs.  (2d Am. Compl't ¶ 55 (ECF 140).)  The Joint Pretrial Order identified 16 such songs.  (ECF 276 at 4.)  The night before trial commenced, Elohim withdrew its claims as to nine of those songs.  (ECF 347; Tr. 2-3.)

3.      The Disputed Works are Korean-language songs originally published in Korea, for which Elohim claims to have filed valid certificates of registration with the United States Copyright Office.  (PX H, I, L, M, N, O, S.)[1]

---

[1] The citation to evidence is exemplary and is not intended to convey that the cited evidence is the only supporting evidence in the trial record.

4.      Defendants dispute that Elohim was properly assigned the copyrights of the Disputed Works.  The Court will begin by reviewing the evidence of the works' assignment to Elohim.

5.      On March 15, 2013, non-party Elohim EPF Korea Ltd. ("Elohim Korea") entered into an Agreement on Management and Assignment of Copyright (the "Songwriter Agreement") with Dong Cheol Kang, also known as "Brave Brother."  (PX D (ECF 346-3); Chang Aff't ¶ 3.)[2]  For consistency and ease of reference, the Court will refer to Dong Cheol Kang as Brave Brother.

6.      The Songwriter Agreement was drafted in Korean and is furnished to the Court in certified English translation.  (PX D at 42.)

7.      In the Songwriter Agreement, Brave Brother assigned to Elohim Korea the exclusive right to administer certain of his musical compositions in the United States, Canada and Japan.  (PX D at 2, Clause 1 ¶ 3; id. at 19, Clause 1 ¶ 3.)  Clause 1, paragraph 2 of the Songwriter Agreement provided a one-year term for the agreement.  (PX D at 2.)

8.      Elohim Korea and Brave Brother renewed the Songwriter Agreement on March 15, 2014.  (PX D at 19.)  Clause 1, paragraph 2 of the renewal provides: "The term of this agreement shall be 2 years, and may be extended every year unless 'A' or 'B' does not disclose the intention to terminate the agreement in writing."  (PX D at 19.)  Clause 3, paragraph 1 provides that Brave Brother "shall guarantee" that the assigned songs "are the complete works created without infringing upon the right of another" and that he "has all the legal status, rights

---

[2] The direct testimony of a witness within a party's control was presented by affidavit attested to on the witness stand and subject to cross-examination and redirect.  In certain instances, the parties waived in whole or in part their right to cross-examine a witness in exchange for a stipulation.

and competence and the entire work property rights . . . ."  (PX D at 3, 20.)  The Songwriter

Agreement has never been terminated.  (Chang Aff't ¶ 14 (ECF 350-1).)

9.      The Songwriter Agreement does not grant Elohim Korea a right to use and

exploit Brave Brother's works within the Republic of Korea.  (Chang Dec. ¶ 2; PX D.)  It

identifies the "Agreement region" as "[c]onfined to Japan and North America (the U.S. and

Canada)."  (PX D at 19.)

10.      The Songwriter Agreement and its renewal of 2014 includes the following

language at Clause 1, paragraph 4:

> Music work mentioned on A's "List of Music Work (Schedule A)"
> that "A" [i.e., Brave Brother] provided to "B" [i.e., Elohim Korea]
> pursuant to this agreement and the music work of "A" during the
> term of this agreement whose copyright is assigned to "B", and such
> music work assigned to "B" is called the Works of this Agreement.
> Further, it is mutually agreed that all the copyright pursuant to the
> assignment share ratio of the Works of this Agreement shall be
> exclusively assigned to "B".

(PX D at 2, 19.)

11.      Schedule A of the Songwriter Agreement is a 300-line spreadsheet headed

"LIST OF SONGS _ ELOHIM-EPF KOREA."  (PX D at 8 et seq.)  The compositions include

the Disputed Works "Hot Boy" (PX D at 10, line 56), "Push Push" (PX D at 12, line 105), and

"So Cool" (PX D at 13, line 115).

12.      It is apparent that "Hot Boy," "Push Push" and "So Cool" were originally

titled in the English language.  (See, e.g., PX H, PX S, DX 15, 16.)  All songs listed in the 300-

line spreadsheet of Schedule A have been identified in English.  Plaintiff's Exhibit D attaches an

interpreter's certification attesting that the exhibit is a true and correct translation from Korean to

English.  (ECF 346-3 at 42.)

13.    The Disputed Works "Sal Man Jji Go," "Ni Kka Jit Ge," "Ga Sik Geol" and "Bae A Pa" are not listed by those titles in Schedule A to the Songwriter Agreement.  (ECF 346-3.)  Defendants urge that because those titles are not listed in Schedule A, Elohim was not validly assigned the United States rights to those works.

14.    In its post-trial submissions, Elohim suggests that "Sal Man Jji Go," "Ni Kka Jit Ge," "Ga Sik Geol" and "Bae A Pa" are listed in Schedule A under their English translations.  (See ECF 361, 362.)  Elohim asserts that in Schedule A, "Ga Sik Geol" is translated as "Shady Girl" (PX D at 13, line 141), "Ni Kka Jit Ge" is translated as "How Dare You" (PX D at 14, line 178), "Sal Man Jji Go" is translated as "Is It Popping" (PX D at 15, line 196) and "Bae A Pa" is translated as "Jealousy" (PX D at 15, line 208).  As will be seen (at ¶¶ 22-26), these English translations of titles were proven at trial.

15.    On September 15, 2013, plaintiff Elohim entered into a subpublishing agreement with Elohim Korea, which assigned to Elohim the exclusive rights to administer certain musical compositions in the United States and Canada (the "Subpublishing Agreement").  (PX A.)  In the Subpublishing Agreement, Elohim Korea "appoints" Elohim as the "exclusive agent to be the sole and exclusive subpublisher and administrator" in the United States and Canada of musical compositions listed at Schedule A to the Subpublishing Agreement.  (Id. ¶¶ 2(a), (b).)  All seven of the Disputed Works are listed in Schedule A of the Subpublishing Agreement, although "Ga Sik Geol" seems to appear as "Ga Sik Girl."  (Id. at 14-17.)  The Subpublishing Agreement has a term extending through June 30, 2018, at which point it began to automatically renew for successive consecutive periods of six months, subject to termination by written notice.  (Id. ¶ 1(a).)  The Subpublishing Agreement has never been terminated.  (Cha Aff't ¶ 69 (ECF 314).)

16.     Elohim thereafter filed certificates of copyright registration with the United States Copyright Office for the Disputed Works.

17.     The copyrights for "So Cool," "Push Push," "Ni Kka Jit Ge," and "Ga Sik Geol" were filed on a single certificate of registration with an effective date of December 29, 2013.  (PX H (ECF 346-7).)  The claimed English translations of the titles "Ni Kka Jit Ge" (a/k/a "How Dare You") and "Ga Sik Geol" (a/k/a "Shady Girl") are not included in the certificate. (Id.)  The certificate lists August 9, 2011 as the date of first publication for all compositions. (Id.)

18.     The copyright for "Bae A Pa" (a/k/a "Jealousy") was issued on a certificate of registration with an effective date of December 19, 2013.[3]  (PX O (ECF 346-14).) The certificate of registration identifies the composition as "BAE A PA_Jealousy."  (Id.) Schedule A of the Songwriter Agreement lists "Jealousy" as a work assigned by Brave Brother to Elohim Korea.  (PX D at 15, line 208.)  "Bae A Pa" is one of ten works listed on the certificate or registration, which cites April 25, 2013 as the first date of publication for all works.  (PX O.) The other nine compositions are not among the Disputed Works.

19.     The copyright for "Hot Boy" was issued on a certificate of registration with an effective date of May 12, 2016.  (PX S (ECF 346-18).)  It is the sole work on the certificate of registration and is identified as "HOT BOY_BIG STAR."  (Id.)

20.     The copyright for "Sal Man Jji Go" was issued on a certificate of registration with an effective date of August 16, 2016.  (PX L (ECF 346-11).)  The work's full

---

[3] For many works, the certificates of registration included both the title's Korean transliteration and an English translation.  In addition to "BAE A PA_Jealousy," the certificate filed at Plaintiff's Exhibit O lists other works as "GIL EUL GEOT DA GA_Walk By," "GIN SAENG MEO RI GEU NYEO_Miss Right" and "NEO TTAEM E MOT SAL A_Mad At U."  (PX O.)

title is identified as "SAL MAN JJI GO_4 MINUTE."  (Id.)  The song title's claimed English translation, "Is It Popping," is not listed on the certificate of registration.  (Id.)

21.     Elohim's post-trial submissions appear to be the first time that Elohim has identified the titles "Bae A Pa" ("Jealousy"), "Ni Kka Jit Ge" ("How Dare You"), "Ga Sik Geol" ("Shady Girl") and "Sal Man Jji Go" ("Is It Popping") with their English-language translations. (ECF 361, 362.)  At the start of trial, the Court inquired of Elohim's counsel where certain of the Disputed Works were listed in Schedule A, and counsel was able to identify only "So Cool," "Push Push" and "Hot Boy."  (Tr. 13.)  Counsel stated: "The others I don't see."  (Id.)

22.     At trial, Hwa Young Chang, the president of Elohim Korea, testified that "Pop In" is the English translation for "Sal Man Jji Go."  (Tr. 282.)  Chang also testified that "Shady Girl" is the English translation for "Ga Sik Geol."  (Tr. 281-82.)

23.     One of defendants' trial exhibits identifies "How Dare You" as an alternate title for "Ni Kka Jit Ge."  (DX 15 at 7.)  As noted, "Jealousy" is listed in the certificate of registration for "Bae A Pa."  (PX O.)

24.     The Joint Pretrial Order does not identify the English translations for "Ni Kka Jit Ge," "Ga Sik Geol" and "Sal Man Jji Go."  The titles "Is It Popping," "Shady Girl" and "How Dare You" do not appear in the Joint Pretrial Order, nor do they seem to appear in any of Elohim's pretrial submissions, including its witness declarations or pretrial memorandum.[4]

25.     The only apparent evidence that "Sal Man Jji Go" is the same work as "Is It Popping" is the trial testimony of Chang, who testified that "Sal Man Jji Go" translates as "Pop In."  (Tr. 282.)  Chang was more precise in testifying that "Ga Sik Geol" translates as "Shady Girl," but even there, his testimony was confused:

Q.          Go to line 141.  What's the name of that song?

---

[4] In one of defendants' exhibits, "Sal Man Zi Go" is listed with the alternate title "Gain Weight."  (DX 15 at 4.)

| | | |
|---|---|---|
| A. | | "Shady Girl." |
| Q. | | What's the title that was song in Korean? |
| A. | | I can't read. |
| [Interpreter] | | May I see it a little closer so I can tell him the number? |
| Q. | | It's line 141.  The line that you just read.  My question is what is the title of that song in Korean? |
| A. | | "Ga Sik Geol." |

(Tr. 281-82.)

        26.    While the evidence is somewhat thin, the Court finds it more likely than not that Schedule A of the Songwriter Agreement, as provided to the Court in English translation, assigned "Ni Kka Jit Ge" to Elohim Korea under the title "How Dare You," "Ga Sik Geol" under the title "Shady Girl" and "Sal Man Jji Go" under the title "Is It Popping."  Any ambiguity about the songs' original Korean titles and their English translations appears to arise from the translator's use of English translation for all titles without a transliteration of the titles' Korean characters.  Defendants do not urge that any song title was, in fact, mistranslated, or that the English-language titles listed in Exhibit A are not faithful translations of the original Korean titles identified by Elohim.  Defendants do not urge that Chang's testimony about the titles was incorrect, even if it was not a model of clarity.  The Court therefore finds by a preponderance of the evidence that Brave Brother assigned to Elohim Korea the rights to all seven of the Disputed Works.

        27.    Separately, defendants have urged that records maintained by the Korean Music Copyright Association ("KOMCA") show that Brave Brother assigned his copyrights in the Disputed Works to entities other than Elohim Korea.  (See generally DX 15, DX 16.) Defendants therefore urge that they have rebutted the presumption that Elohim has valid and enforceable certificates of registration for the Disputed Works.

28.     Dahae Chung, who has the title Director of the International Office at KOMCA, describes KOMCA as a "non-profit copyright collective for musical works that administers public performance, broadcasting rights, public transmissions rights, mechanical recording and reproduction rights."  (Chung Dec. ¶ 8 (ECF 340); see also id. ¶ 16.)  She states that the Korea Copyright Act does not require authors to register a work with the Korea Copyright Registry in order to receive copyright protection, and that instead, authors apply for inclusion in KOMCA.  (Id. ¶¶ 6-7.)  Korea's Ministry of Culture, Sports and Tourism conducts twice-annual audits of KOMCA's registrations.  (Tr. 216.)

29.     Copyright owners may join KOMCA by submitting a Copyright Trust Agreement that acts as a contract between the original copyright owners and KOMCA.  (Chung Dec. ¶¶ 18-28.)  The agreement provides in part that KOMCA "shall manage the trusted copyright and will distribute royalties consequently obtained to the Trustor."  (Id. ¶ 29.)  It also provides that the trustee "shall conduct business in the . . . Republic of Korea" and in "[o]peration areas of foreign copyright management organizations which are entrusted with management of copyright by the Trustee."  (Id. ¶ 29.)  KOMCA allows members to conditionally transfer a copyright to a publishing company, provided that proper documentation is registered with KOMCA.  (Id. ¶¶ 30-39.)

30.     Once a work is registered with KOMCA, any transfer of a copyright must be reported to and registered with KOMCA.  (Tr. 218-221.)

31.     KOMCA has reciprocal agreements with copyright-management organizations ("CMOs") outside the Republic of Korea, including United States-based CMOs the American Society of Composers, Authors, and Publishers ("ASCAP") and Broadcast Music Inc. ("BMI").  (Chung Dec. ¶ 40.)  Chung states that pursuant to these reciprocal agreements, the

American CMOs collect royalties from the performance of KOMCA members' works, and the members are then paid royalties through KOMCA.  (Chung Dec. ¶¶ 41-59.)

32.     KOMCA maintains a public, searchable online database of member works.  (Chung Dec. ¶¶ 87-89.)  Defendants have submitted search results from KOMCA's public database.  (DX 15 (ECF 340-8).)  The results from the KOMCA database reflect that on August 28, 2020, Brave Brother[5] assigned his copyright in the Disputed Works to a company named MelodyGallery.  (DX 15.)  The KOMCA database does not identify any transfer to Elohim Korea.  Defendants also have submitted a chart compiled by KOMCA for this litigation.  (DX 16 (ECF 340-9).)  This chart reflects that on August 28, 2020, Brave Brother assigned publication rights in all seven of the Disputed Works to MelodyGallery, for a term running until December 31, 2999.  (Id.)  Under the category "Publication Status," there is a column headed "Region" and "World" appears next to the name MelodyGallery.  (Id.)  This strongly implies that MelodyGallery was granted worldwide publication rights for the seven Disputed Works.

33.     Defendants' Exhibit 16 reflects that on April 1, 2021, MelodyGallery conditionally transferred the copyrights for six of the seven Disputed Works to a company called Enablefind.  The exhibit states that the conditional transfer assigned rights to "59 Countries (Excluding US, India, Cuba)."  "Ga Sik Geol" (a/k/a "Shady Girl") is the only Disputed Work that was not conditionally transferred to Enablefind.

34.     For the song "Sal Man Jji Go," KOMCA's public database lists Brave Brother as the author and composer.  (DX 15 at 4.)  It identifies three arrangers: Brave Brother, Lee Jeong Min and Cokkiri Wangguk, also known as "Elephant Kingdom."  (Id.)  Defendants

---

[5] As noted, Brave Brother is the stage name of the performer Dong Cheol Kang; the stage name "Brave Brother" appears to be the English translation of the Korean phrase "Yongamhan Hyungje."  (See, e.g., Def. Post-Trial Mem. at 2; DX 15, 16; PX H.)  The KOMCA records identifies Yongamhan Hyungje as the writer of the Disputed Works.  There is no suggestion that Yongamhan Hyungje is a person other than Dong Cheol Kang a/k/a Brave Brother.

point out that no evidence suggests that Lee Jeong Min and Cokkiri Wangguk assigned any

rights in "Sal Man Jji Go" to Elohim Korea.  The Court finds that the reference to these two

individuals in the KOMCA database, without more, does not establish their rights to "Sal Man Jji

Go" or defeat Brave Brother's assignment to Elohim Korea.

      35.    Three witnesses testified that KOMCA does not record agreements with

subpublishers for territories outside of Korea.  Chung testified:

> Q. Ms. Chung, is it your testimony in this lawsuit that KOMCA
> requires that contracts with a subpublisher in a foreign region, such
> as the United States, must be reported to KOMCA?
> A. No, if you're talking about the subpublisher, no.
> Q. So you are saying that KOMCA does not require that contracts
> with a subpublisher in a foreign region, such as the United States, is
> required to be reported to KOMCA?
> A. That is not a prerequisite.

(Tr. 210.)  David Chang, the president of Elohim Korea, stated in his direct testimony: "It is also

my understanding that only domestic publishing agreements for South Korea may (but do not

have to) be reported to KOMCA, and that publishing agreements with foreign publishers (like

Elohim Korea) and foreign subpublishers (like Elohim) do not have to be reported to KOMCA,

and that in any event KOMCA does not keep track of such foreign rights."  (Chang Aff't ¶ 7

(ECF 350-1).)  David Cha, the president of Elohim, states that he has served as a liaison between

KOMCA and ASCAP, and that "foreign publishers are not required to register with KOMCA."

(Cha Rebuttal Aff't ¶¶ 3, 5 (ECF 348).)

      36.    Defendants have not demonstrated that the KOMCA records defeat or

alter the assignments from Brave Brothers to Elohim Korea.  The Songwriter Agreement

provided that Elohim Korea would have rights to certain Brave Brothers works in the United

States, Canada and Japan, and the Subpublisher Agreement assigned United States rights from

Elohim Korea to Elohim.  Chung testified that KOMCA does not require registration of a

subpublishing agreement for a work's exploitation outside Korea, specifically including in the United States.  Further, the MelodyGallery conditional transfer to Enablefind excludes the United States from the assignment, whereas the Songwriter Agreement between Brave Brother and Elohim Korea, and the subsequent Subpublisher Agreement between Elohim Korea and Elohim, expressly provided for the assignment of rights in the United States.

37.     The Court therefore finds that the KOMCA records do not defeat the assignment of United States publishing rights from Brave Brother to Elohim Korea, and their subsequent assignment from Elohim Korea to Elohim.

38.     Elohim asserts that the Disputed Works were unlawfully performed and displayed in the defendant karaoke establishments.  It relies on the testimony of witnesses In Sung Park, Sun Man Hwang and Nam Hyung Yoo, who visited the defendant karaoke establishments, paid to reserve a private karaoke room, and then used karaoke machines provided by the establishments to perform the Disputed Works.

39.     Park and Yoo each testified that Elohim CEO and President David Cha hired them to inspect the defendant karaoke establishments and determine whether they were publicly displaying and performing the Disputed Works.  (Park Dec. ¶ 2 (ECF 315); Yoo Dec. ¶ 2 (ECF 316).)  Hwang testified that Cha hired him for the same purpose, and Hwang visited one of the defendant establishments.  (Hwang Dec. ¶ 2 (ECF 317).)

40.     The defendant karaoke establishments operate in identical or near-identical ways.  Upon their arrival, an employee of each business arranged for the paid use of a private karaoke room.  Each room included a karaoke machine and songbook that listed works available for selection.  Employee authorization was necessary to access and use the room.  Once a song was selected and began to play, its title and lyrics would appear on a video screen.  There

is no evidence that any establishment provided a large common room where karaoke could be performed before unaffiliated patrons of the establishment.  (See generally Park Declaration; Hwang Declaration; Yoo Declaration.)

    41. Any variations between the establishments is small.  Not every customer used the "private" rooms to perform karaoke; some customers utilized the "private" rooms to order drinks or food without performing karaoke.  (See, e.g., Tr. 115, 126-27, 151.)  Defendant CEO Business Club charges a minimum of $300 per room instead of setting an hourly rate.  (Tr. 152.)  Flower Karaoke imposes a minimum charge of $40 per hour after 8 p.m.  (Tr. 132.)

    42. All defendants purchased their karaoke machines from a Korean manufacturer named Taejin Media, which is commonly known as "TJ Media."  For example, Music Box K-TV, purchased its machines from TJ Media, and each machine has thousands of songs.  (Tr. 104; see also Tr. 152 (testimony of Hyun Hak Yi that each TJ Media machine has tens of thousands of songs); Tr. 307 (testimony of David Cha that each machine has more than 55,000 songs).)  For a monthly fee, TJ Media updates the machines' song library to include new and popular songs.  (Tr. 105; see also Tr. 119 (Base Karaoke purchased machines from TJ Media, that each machine contains thousands of songs and pays a monthly fee per machine).)  Flower Karaoke paid $1,000 to purchase each TJ Media machine and pays approximately $300 per month for updates to the song libraries of thirteen machines.  (Tr. 133; see also Tr. 151-52 (each TJ Media machine cost approximately $1,000, plus monthly fees of $25 or $30 per machine to update the song library).)

    43. At each defendant establishment, Park, Hwang and Yoo paid a fee for access to a private karaoke room, which included a songbook listing works available for performance, and a karaoke machine used to play instrumental music and display lyrics on a

screen.  They then performed one or more of the Disputed Works using the room's karaoke machine.  The Court will summarize their testimony concerning each establishment.

44.    The Court will also summarize the relevant evidence about each defendant karaoke establishment, as described in the parties' Joint Stipulation of Facts that was entered as an Order of the Court on July 17, 2023 (ECF 352) and in witness testimony.

45.    162 D & Y Corp. d/b/a Flower Karaoke.  Yoo and Park testified that, with Cha, they visited Flower Karaoke on February 27, 2018, where they paid a fee to access a private karaoke room and performed the Disputed Works "Sal Man Jji Go," "Ga Sik Geol" and "Bae A Pa."  (Park Dec. ¶¶ 3-6; PX Y (photos of karaoke monitors displaying lyrics from Disputed Works); see also Yoo Dec. ¶¶ 3-6.)  Flower Karaoke has 13 individual karaoke rooms, each of which contains a TJ Media karaoke machine, a sound system, a screen for customers to view lyrics and soundproofing.  (Tr. 125, 132, 142.)  Flower Karaoke is open to the public and holds itself out as a karaoke establishment.  (Tr. 127-28, 131.)  Many of its customers perform karaoke in the private karaoke rooms.  (Tr. 129-30.)  It began paying a licensing fee to BMI and ASCAP in 2018 but it has never paid a license fee to Elohim.  (Tr. 142-44.)  It pays TJ Media a monthly total fee of $300 for the use of machines, which receive daily automatic updates from TJ Media.  (Tr. 133.)

46.    Y & P Bayside Corp. d/b/a Happy Karaoke.  Yoo and Park testified that, with Cha, they visited Happy Karaoke on February 27, 2018, where they paid a fee to access a "private" karaoke room and performed the Disputed Works "So Cool," "Sal Man Jji Go," "Ga Sik Geol" and "Bae A Pa."  (Park Dec. ¶¶ 7-10; PX Z (photos of karaoke monitors displaying lyrics from Disputed Works); see also Yoo Dec. ¶¶ 7-10.)  Happy Karaoke has 15 individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of thousands of

songs, a sound system, a screen to view lyrics and songs and soundproofing.  (Joint Stip. at 2.)

Happy Karaoke is open to the public, holds itself out as a karaoke establishment, and about half

of all customers perform karaoke.  (Id. at 3.)  In 2017 and 2018, Happy Karaoke had licensing

agreements with ASCAP and BMI, but never paid a license fee to Elohim.  (Id. at 4.)  It pays TJ

Media a monthly maintenance fee of $40 per machine.  (Id.)

> 47.  Musicbox KTV, Inc. d/b/a Music Box K-TV.  Yoo and Park testified that,
with Cha, they visited Music Box K-TV on February 27, 2018, where they paid a fee to access a
"private" karaoke room and performed the Disputed Works "So Cool," "Push Push," "Sal Man
Jji Go," "Ni Kka Jit Ge" and "Bae A Pa."  (Park Dec. ¶¶ 11-14; PX AA (photos of karaoke
monitors displaying lyrics from Disputed Works); see also Yoo Dec. ¶¶ 11-14.)  Music Box
Karaoke has 13 individual karaoke rooms, each of which contains a TJ Media karaoke machine
with thousands of songs, a sound system, a screen to view lyrics and songs, and soundproofing.
(Tr. 96-97, 104.)  Music Box Karaoke is open to the public, holds itself out as a karaoke
establishment and a majority of its customers perform karaoke.  (Tr. 98-100, 103-04.)  The
owner of Music Box Karaoke testified that he believes licenses for the use of songs were paid
through TJ Media and that he never paid a license fee to Elohim or any other entity.  (Tr. 106-
07.)  It pays TJ Media a monthly fee to update each karaoke machine with new songs.  (Tr. 105.)

> 48.  SS Noblesse House, Inc. d/b/a SS Noblesse House.  Yoo and Park testified
that, with Cha, they visited SS Noblesse Karaoke on February 28, 2018, where they paid a fee to
access a "private" karaoke room and performed the Disputed Works "Push Push," "Sal Man Jji
Go," "Ga Sik Geol" and "Bae A Pa."  (Park Dec. ¶¶ 15-18; PX BB (photos of karaoke monitors
displaying lyrics from Disputed Works); see also Yoo Dec. ¶¶ 15-18.)  Noblesse House has 11
individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of

thousands of songs, a sound system, a screen to view lyrics and songs and soundproofing.  (Joint

Stip. at 5.)  Noblesse House is open to the public, holds itself out as a karaoke establishment, and

a majority of all customers perform karaoke.  (Id. at 6.)  In 2017 and 2018, Noblesse House did

not have licensing agreements with ASCAP or BMI, and never paid a license fee to Elohim.  (Id.

at 7.)  It pays TJ Media a monthly maintenance fee of $25 per machine.  (Id. at 6.)

      49.    <u>Place of Happy and Lucky d/b/a The King Karaoke</u>.  Yoo and Park

testified that, with Cha, they visited The King Karaoke on February 28, 2018, where they paid a

fee to access a "private" karaoke room and performed the Disputed Works "Push Push," "Sal

Man Jji Go," "Ni Kka Jit Ge" and "Ga Sik Geol."  (Park Dec. ¶¶ 19-22; PX CC (photos of

karaoke monitors displaying lyrics from Disputed Works); <u>see also</u> Yoo Dec. ¶¶ 19-22.)  King

Karaoke has 13 individual karaoke rooms, each of which contains a TJ Media karaoke machine

with tens of thousands of songs, a sound system, a screen to view lyrics and songs and

soundproofing.  (Joint Stip. at 7.)  King Karaoke is open to the public, holds itself out as a

karaoke establishment, and fewer than half of its customers perform karaoke.  (Id. at 8.)  In 2017

and 2018, King Karaoke did not have a licensing agreement with ASCAP or BMI, and it never

paid a license fee to Elohim.  (Id. at 9.)  It pays TJ Media a monthly maintenance fee of $25 per

machine.  (Id.)[6]

      50.    <u>YS2 Enterprises, Inc. d/b/a CEO Business Club</u>.  Yoo and Park testified

that, with Cha, they visited CEO Business Club on February 28, 2018, where they paid a fee to

access a "private" karaoke room and performed the Disputed Work "Ga Sik Geol."  (Park Dec.

---

[6] The Complaint alleged upon information and belief that defendant Gunha Song directs and controls the management of The King Karaoke.  (2d Am. Compl't ¶ 24.)  Song's name does not appear in the parties' Joint Pretrial Order and is not included in that Order's caption.  (ECF 287.)  Song has never been dismissed from this case.  The Court deems any claim against Song to have been voluntarily abandoned and all claims against Song will be dismissed.

¶¶ 23-26; PX DD (photos of karaoke monitors displaying lyrics from Disputed Works); see also Yoo Dec. ¶¶ 23-26.)  CEO Business Club has 10 individual karaoke rooms, each of which contains a TJ Media karaoke machine, a sound system, a screen to view lyrics and songs, and soundproofing.  (Tr. 148, 151.)  CEO Business Club is open to the public, holds itself out as a karaoke establishment, and about half of its customers perform karaoke.  (Tr. 149-51.)  In 2017 and 2018, CEO Business Club did not have a licensing agreement with ASCAP or BMI, and it never paid a license fee to Elohim.  (Tr. 154.)  It pays TJ Media a monthly fee of $25 or $30 per machine.  (Tr. 152.)

     51.    <u>Sagwa Namoo, Inc. d/b/a Sagwa Namoo</u>.  Yoo and Park testified that, with Cha, they visited Sagwa Namoo on February 28, 2018, where they paid a fee to access a "private" karaoke room and performed the Disputed Work "Hot Boy."  (Park Dec. ¶¶ 27-30; PX EE (photos of karaoke monitors displaying lyrics from Disputed Works); see also Yoo Dec. ¶¶ 27-30.)  Sagwa Namoo has 11 individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of thousands of songs, a sound system, a screen to view lyrics and songs and soundproofing.  (Joint Stip. at 10.)  Sagwa Namoo is open to the public, holds itself out as a karaoke establishment, and the majority of all customers perform karaoke.  (Id. at 11.)  In 2017 and 2018, Sagwa Namoo did not have a licensing agreement with ASCAP or BMI, and it never paid a license fee to Elohim.  (Id. at 12.)  It pays TJ Media a monthly maintenance fee of $25 per machine.  (Id. at 11.)

     52.    <u>Base Karaoke, Inc. d/b/a K-2 Karaoke f/k/a Base Karaoke</u>.  Yoo and Park testified that, with Cha, they visited K-2 Karaoke on March 8, 2018, where they paid a fee to access a "private" karaoke room and performed the Disputed Works "So Cool," "Push Push," "Sal Man Jji Go," "Ga Sik Geol" and "Bae A Pa."  (Park Dec. ¶¶ 35-38; PX GG (photos of

karaoke monitors displaying lyrics from Disputed Works); <u>see also</u> Yoo Dec. ¶¶ 35-38.)  Base Karaoke has eight individual karaoke rooms, each of which contains a TJ Media karaoke machine, a sound system, a screen to view lyrics and songs, and soundproofing.  (Tr. 111-12, 119.)  Base Karaoke is open to the public, holds itself out as a karaoke establishment and more than half of its customers perform karaoke.  (113, 115-18.)  It pays licensing fees to BMI and ASCAP but not to Elohim.  (Tr. 121.)  It also pays a monthly fee to TJ Media.  (Tr. 119.)[7]

53.    <u>Open Karaoke Corp. d/b/a Yulrin Karaoke a/k/a Open Karaoke</u>.  Yoo and Park testified that, with Cha, they visited Open Karaoke on February 28, 2018, where they paid a fee to access a "private" karaoke room and performed the Disputed Works "Sal Man Jji Go," "Ni Kka Jit Ge," "Ga Sik Geol" and "Bae A Pa."  (Park Dec. ¶¶ 39-42; PX HH (photos of karaoke monitors displaying lyrics from Disputed Works); <u>see also</u> Yoo Dec. ¶¶ 39-42.)  Open Karaoke has 11 individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of thousands of songs, a sound system, a screen to view lyrics and songs and soundproofing. (Joint Stip. at 13.)  Open Karaoke is open to the public, holds itself out as a karaoke establishment, and the majority of all customers perform karaoke.  (<u>Id.</u> at 14.)  In 2017 and 2018, Sagwa Namoo did not have a licensing agreement with ASCAP or BMI, and it never paid a license fee to Elohim.  (<u>Id.</u> at 14-15.)  It pays TJ Media a monthly maintenance fee of $25 per machine.  (<u>Id.</u> at 14.)[8]

---

[7] The Complaint originally alleged that an entity named Manhattan Ziller Ziller, Inc. owned an entity named K2 Karaoke and that New Manhattan Ziller Ziller, Inc. owned an entity named Base Karaoke.  (2d Am. Compl't ¶¶ 7, 10.)  In the Joint Pretrial Order, the parties stipulated that Base Karaoke, Inc. operates Base Karaoke.  (ECF 276 at 3.)  There is no dispute that Base Karaoke does business as K-2 Karaoke.  The Joint Pretrial Order makes no reference to any "Ziller Ziller" entity.

[8] The Complaint originally alleged that an entity named Norae Hahnun Jib Corp. did business as Open Karaoke.  (2d Am. Compl't ¶ 25.)  In the Joint Pretrial Order, the parties stipulate that Open Karaoke, Inc. operates Open Karaoke. (ECF 276 at 3.)

54.     <u>Sing Sing Bell, Inc. d/b/a Christmas Karaoke</u>.  Yoo and Park testified that, with Cha, they visited Christmas Karaoke on March 8, 2018, where they paid a fee to access a "private" karaoke room and performed the Disputed Works "So Cool," "Sal Man Jji Go" and "Bae A Pa."  (Park Dec. ¶¶ 43-46; PX II (photos of karaoke monitors displaying lyrics from Disputed Works); <u>see also</u> Yoo Dec. ¶¶ 42-45.)  Christmas Karaoke has 15 individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of thousands of songs, a sound system, a screen to view lyrics and songs and soundproofing.  (Joint Stip. at 16.)  Christmas Karaoke is open to the public, holds itself out as a karaoke establishment, and the majority of all customers perform karaoke.  (<u>Id.</u> at 16-17.)  In 2017 and 2018, Christmas Karaoke had licensing agreements with ASCAP and BMI, but it never paid a license fee to Elohim.  (<u>Id.</u> at 17-18.)  It pays TJ Media a monthly maintenance fee of $25 per machine.  (<u>Id.</u> at 17.)

55.     <u>Bizmax NY, Inc. d/b/a Wow Karaoke</u>.  Yoo and Park testified that, with Cha, they visited Wow Karaoke on March 8, 2018, where they paid a fee to access a "private" karaoke room and performed the Disputed Works "So Cool," "Push Push," "Sal Man Jji Go," "Ni Kka Jit Ge," "Ga Sik Geol" and "Bae A Pa."  (Park Dec. ¶¶ 47-50; PX JJ (photos of karaoke monitors displaying lyrics from Disputed Works); <u>see also</u> Yoo Dec. ¶¶ 47-50.)  Wow Karaoke has eight individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of thousands of songs, a sound system, a screen to view lyrics and songs and soundproofing.  (Joint Stip. at 20.)  Wow Karaoke is open to the public, holds itself out as a karaoke establishment, and the majority of all customers perform karaoke.  (<u>Id.</u> at 21.)  In 2017 and 2018, Wow Karaoke had a licensing agreement with ASCAP and BMI, but it never paid a license fee to Elohim.  (<u>Id.</u> at 22.)  It pays TJ Media a monthly maintenance fee of $25 per machine.  (<u>Id.</u>)

56.     <u>M & S Music Studio, Inc. d/b/a Gagopa Karaoke</u>.  Yoo and Hwang testified that they visited Gagopa Karaoke on September 10, 2021, where they paid a fee to access a "private" karaoke room and performed the Disputed Works "Push Push," "Sal Man Jji Go," "Ga Sik Geol," "Bae A Pa" and "Hot Boy."  (Hwang Dec. ¶¶ 7-10; <u>see also</u> Yoo Dec. ¶¶ 51-54.)  Gagopa Karaoke has five individual karaoke rooms, each of which contains a TJ Media karaoke machine with tens of thousands of songs, a sound system, a screen to view lyrics and songs and soundproofing.  (Joint Stip. at 18.)  Gagopa Karaoke is open to the public, holds itself out as a karaoke establishment, and the majority of all customers perform karaoke.  (<u>Id.</u> at 19.)  In 2017 and 2018, Gagopa Karaoke had a licensing agreement with ASCAP and BMI, but it never paid a license fee to Elohim.  (<u>Id.</u> at 20.)  It pays TJ Media a monthly maintenance fee of $25 per machine.  (<u>Id.</u> at 19.)

57.     Elohim or its outside counsel sent cease-and-desist letters to defendants in four different batches, dated March 23, 2017, August 1, 2017, April 16, 2018 and May 16, 2018.  (PX V (ECF 314-21).)  The contents of the letters appear identical or near-identical, and they threatened to bring litigation unless defendants halted infringing activities on unspecified works.

58.     Elohim sent a first set of letters to defendants on March 23, 2017.  (<u>Id.</u> at 80-98.)  The letters were written in the Korean language and sent on Elohim letterhead.  Elohim does not appear to have furnished copies of the letters in translation and their contents are unclear.

59.     Kenneth K. Yoo, outside counsel to Elohim, sent the second set of letters to defendants on August 1, 2017.  (<u>Id.</u> at 2-23.)  All letters appear to be identical or near-identical, except for the recipients' identities.  (<u>Id.</u>)  Each letter asserted that the recipient was liable under the Copyright Act for the unlicensed performance of unspecified works owned by

Elohim.  (Id.)  Each letter asserted that Elohim had rights to 17,000 songs, none of which were

named.[9]  (Id.)  The letters stated that Elohim could be awarded up to $150,000 in statutory

damages per violation, but that Elohim would forego litigation if the letter's recipient agreed to

pay a licensing fee based on either the number of its karaoke machines or its square footage.

(Id.)  Without specifying any works, the letters also stated, "We have in our possession evidence

that your establishment has caused to play for the public the musical sound recordings of artists

that Elohim represent [sic] without obtaining any licensing to do so."  (Id.)

      60.     There is no evidence that Elohim had actual knowledge that defendants

had engaged in infringing activities when it sent the letters of August 1, 2017.  Elohim and its

representatives began to visit the defendant establishments in February 2018.  It is possible that

in August 2017, Elohim had a good-faith reason to know or suspect that defendants were making

the Disputed Works available for display and performance, but it is also possible that Elohim

was casting a wide net by demanding payment from Korean karaoke establishments without

specific information that they had engaged in infringing activities.

      61.     The next set of letters was dated April 16, 2018, written on Elohim

letterhead and signed by David Cha.  (Id. at 25-46.)  Again, the letters did not cite to any

individual works owned by Elohim or identify any works purportedly infringed by the letters'

recipients.  (Id.)  The letters described Elohim's track record of success in copyright litigation,

and advised their recipients as follows:

> Please note that ASCAP, BMI, SESAC and none of the collection
> societies in the United States have rights for your lyrics.  This is
> "Display Rights" which none of the Karaoke Bars have this license
> for their music.  We are the only company have [sic] the Display
> rights for your establishments and you have infringed since you
> started your operation on [sic] your business.  And please note that
> KOMCA (Korea Music Copyright Association) has no right

---

[9] At trial, by contrast, Cha testified that Elohim has copyrights for more than 3,000 songs.  (Tr. 312.)

> whatsoever in the United States.  KOMCA has the rights in Korea,
> not in U.S.  Please do not listen to your attorneys!

(Id.)  The letters were sent in both English and Korean.  (Id.)

62.     Brandon M. Tesser, outside counsel to Elohim, sent a fourth batch of
letters dated May 16, 2018.  (Id. at 47-78.)  Again, the letters did not identify any works
infringed by defendants or owned by Elohim.  They recounted Elohim's successfully litigation
history and accused each letter's recipient of infringing Elohim's copyrights.

63.     A recipient of these letters would not know which songs Elohim claimed
to own or what songs were claimed to be unlawfully performed and displayed at the recipient's
establishment.  The 2017 letters appear to predate any of Elohim's visits to defendants'
establishments for the purpose of determining whether defendants had infringed Elohim's
performance rights.  The letters did not give their recipients intelligent notice of any purportedly
infringing conduct or any reason to believe that Elohim had a meritorious claim for copyright
infringement.  The admonition in the letter of April 16, 2018 that the recipient should "not listen"
to attorney advice or rely on licenses from ASCAP or BMI gives the communication the quality
of a shakedown.

64.     Each of the individual defendants has filed a declaration setting forth
direct testimony about the karaoke establishment he or she owns and operates.  (ECF 321-35.)
These declarations are identical or near-identical, and appear to be copy-and-paste jobs.  Each
declaration stated in identical or near-identical wording that the declarant had received a cease-
and-desist letter from Elohim or its outside counsel.  (See, e.g., Anthony Kim Dec. ¶¶ 46-47;
Dong Hun Kim Dec. ¶¶ 46-47.)  Under cross-examination, however, many witnesses testified
that they did not receive the cease-and-desist letters.  (See, e.g., Tr. 105 (testimony of Anthony
Kim that "we actually never received the cease and desist letters" and agreeing with counsel that

portion of his witness declaration was "false"); see also Tr. 119-21, 161-62, 256-57, 246-48, 250-52 (testimony from witnesses denying that they received Elohim's cease-and-desist letters).)

65.     Defendants Happy Karaoke, Sagwa Namoo, Open Karaoke and King Karaoke forwarded the cease-and-desist letters to their attorneys.  (Joint Stip. at 4, 9, 12, 15.)

CONCLUSIONS OF LAW

1.     Elohim asserts that defendants infringed Elohim's exclusive display and performance rights over the Disputed Works.  It asserts claims of direct, contributory and vicarious copyright infringement, as well as a claim of inducing copyright infringement.

2.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright . . . ."  17 U.S.C. § 501(a).  The Copyright Act provides that "the owner of copyright under this title has the exclusive rights. . . in the case of . . . musical . . . works . . . to perform the copyrighted work publicly . . . ."  17 U.S.C. § 106(4).  "To 'perform' a work means to recite . . . either directly or by means of any device or process . . . ."  17 U.S.C. § 101.

3.     The Court will first address defendants' contention that they have rebutted the presumption of enforceability in Elohim's certificates of copyright registration for the Disputed Works.

4.     "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c); see also Urbont v. Sony Music Ent., 831 F.3d 80, 88-89 (2d Cir. 2016) ("Production of a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright.").  "A certificate of copyright

registration is a prerequisite to asserting a civil copyright infringement claim.  Thus, without a valid copyright registration, a plaintiff cannot bring a viable copyright infringement action." Sohm v. Scholastic Inc., 959 F.3d 39, 52-53 (2d Cir. 2020) (citing 17 U.S.C. § 411(a)).

       5.   A court "must presume" that a party "holds valid copyrights" based on the certificate of registration issued by the Copyright Office.  Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001).

       6.   The Court concludes that Elohim is entitled to the presumption of validity for its copyrights in the Disputed Works based on the certificates of registration issued by the Copyright Office within five years of the works' first publication.

       7.   "Generally speaking, the presumption of validity may be rebutted where other evidence in the record casts doubt on the question."  Fonar Corp. v. Domenick, 105 F.3d 99, 104 (2d Cir. 1997) (emphasis in original; quotation marks and brackets omitted); accord Urbont, 831 F.3d at 89 ("Although the plaintiff bears the burden of proving copyright ownership, the party challenging the validity of the copyright registration has the burden to prove the contrary.") (quotation marks and brackets omitted).  The presumption can be rebutted by demonstrating a fatal deficiency in the work's protectability or underlying copyright application: "The presumption has been overcome . . . by evidence that the work had been copied from the public domain, or by evidence that the work was a non-copyrightable utilitarian article."  Fonar, 105 F.3d at 104 (internal citations omitted); see also Boisson, 273 F.3d at 267 (noting district court's finding of insufficient proof that plaintiff deliberately misled the Copyright Office in submitting applications).

       8.   To rebut the presumption of validity, defendants must prove by a preponderance of the evidence that the copyright was not properly registered.  The Second

Circuit has affirmed a district court's instructions to a jury that the presumption of validity was rebutted if defendants proved by a preponderance of the evidence that a copyright applicant concealed material information about authorship.  Medforms, Inc. v. Healthcare Mgmt. Sols., Inc., 290 F.3d 98, 114 (2d Cir. 2002).  It has also stated that where a certificate of registration has been entered into evidence, "[t]he party challenging the validity of the copyright has the burden to prove the contrary."  Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999). Defendants do not urge that some lesser burden ought to apply.

9.   As noted in the Findings of Fact, defendants have urged that based on KOMCA records, the assignment of rights to Elohim was not valid because Elohim could not demonstrate a chain of title in the Disputed Works extending from Brave Brother to Elohim. Defendants have urged that this defeats the presumption of validity.  Because the Court finds that rights in the Disputed Works were assigned from Brave Brother to Elohim Korea through the Songwriter Agreement, and then assigned from Elohim Korea to Elohim through the Subpublishing Agreement, the Court concludes that defendants have not rebutted the presumption of validity based on any purported defects in the assignment of copyright over the Disputed Works.  The Court similarly concludes that Elohim has not defeated the presumption of validity based on the English translations of Korean song titles included in Schedule A of the Songwriter Agreement.

10.   In their post-trial submissions, defendants contend for the first time that certain of Elohim's certificates of registration are defective because they list multiple musical works on a single certificate of registration.  (See ECF 363 at 12-20.)  Defendants urge that the certificate of registration for the Disputed Work "Bae A Pa" is invalid because it is one of ten songs listed in a single certificate.  (See PX O (ECF 346-14).)  Defendants also urge that the

certificate of registration listing "Ni Kka Jit Ge," "Ga Sik Geol," "So Cool," and "Push Push," is invalid because all works are registered in a single certificate.  (PX M (ECF 346-12).)  The Copyright Act and regulations promulgated thereunder permit multiple works to be listed in a certificate of registration if they comprise a "single work," a "compilation" or a "group registration."  Defendants assert that the certificates of registration do not satisfy any of the three categories.

11.   On invitation from the Court, Elohim filed a letter-brief in response. (ECF 366-67.)  Elohim states that the certificates of registration submitted as Plaintiffs Exhibits O and M each were for a collection of works published in a single unit of publication, to wit, that the songs were published together as music CDs.  (ECF 367.)  Elohim does not assert that the certificates of registration listed the works as part of either a group registration or a compilation.

12.   The Copyright Office has promulgated a regulation for the registration of a "single unit of publication," which provides that "[f]or the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work: (A) In the case of published works: all copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same . . . ."  37 C.F.R. § 202.3(b)(4)(i)(A) (effective July 18, 2013).  The substantive portion of this language has remained unchanged since 2013.  See 37 C.F.R. § 202.3(b)(4) (effective Oct. 31, 2022).

13.   A large number of non-binding precedents have interpreted the regulation to require that for a collection of works to qualify as a "single unit of publication," they must share the same first date of publication and be published together simultaneously.  Writing in 2010, Judge Rakoff observed that "there is no controlling case on point," and relied on informal

interpretative guidance from the Copyright Office stating that "'[w]orks that are otherwise recognizable as self-contained may be registered on a single application and upon payment of a single fee, if they are <u>first</u> <u>published</u> in a single unit of publication and the copyright claimant of all works in the unit is the same.'"  <u>McLaren v. Chico's FAS, Inc.</u>, 2010 WL 4615772, at *3 (S.D.N.Y. Nov. 9, 2010) (emphasis in original; quoting United States Copyright Office, "Compendium II: Compendium of Copyright Office Practices § 607.01" (1988)[10].)  Judge Rakoff proceeded to conclude that even without the benefit of informal administrative guidance, the phrase "single unit of publication" as used in the regulation requires the constituent works to share a common publication date:

> The most natural reading of the regulation's requirement that the copyrightable works form a "single unit of publication" is that the works must be first published together to qualify as such. . . . [T]he "single work" regulation's term "single unit of publication" refers to the circumstances of the publication, rather than the relationship of the works to one another, and, further, that the prior, separate publication of a copyrightable work precludes that work from being treated later, together with other published elements, as a "single unit of publication."

<u>McLaren</u>, 2010 WL 4615772, at *3.

14.  Several courts have followed the reasoning of <u>McLaren</u> and concluded that the presumption of validity in a certificate of registration was rebutted where works claimed to be contained in a "single unit of publication" were separately published on earlier dates.  <u>See,</u> <u>e.g.</u>, <u>Senisi v. John Wiley & Sons, Inc.</u>, 2015 WL 7736545, at *3 (S.D.N.Y. Nov. 30, 2015) (if one or more works "were not published together for the first time as a single unit," that separate publication amounts to "an incurable defect of their registration.") (Swain, J.); <u>O.W.A., Inc. v.</u> <u>Gump's Corp.</u>, 2014 WL 12235191, at *5 (N.D. Ga. Oct. 9, 2014) ("the catalogs are not

---

[10] <u>Available at</u> https://www.copyright.gov/history/comp/compendium-two-1988-chap1600-1900.pdf

considered a single unit of publication because the works therein were not first published

together."); Olander Enterprises, Inc. v. Spencer Gifts, LLC, 812 F. Supp. 2d 1070, 1077 (C.D.

Cal. 2011) ("the Court has not identified any other court that has rejected the interpretation that

works must be first published together in order to satisfy the single unit of publication

requirement.").

        15.   In response, Elohim asserts that the certificates or registration were

properly issued because the listed works were published together as part of a single CD or music

album.  (ECF 367-68.)  This does not address defendants' argument about the individual prior

dates of publication, however.  Elohim cites Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,

959 F.3d 1194, 1199 (9th Cir. 2020), vacated and remanded on other grounds, 595 U.S. 178

(2022), to support the proposition that otherwise self-contained works can be a "single unit"

when the single works "covers the unification of such works . . . ."  But the holding of Unicolors

is that in order to be properly registered as a single unit of publication, all individual works must

first be published as a single unit.  Id. at 1200 ("[W]e hold that a collection of works does not

qualify as a 'single unit of publication' unless all individual works of the collection were first

published as a singular, bundled unit.  Therefore, it is an inaccuracy for a registrant . . . to

register a collection of works . . . as a single-unit publication when the works were not initially

published as a singular, bundled collection.").

        16.   The Court assumes without deciding that in order for a certificate of

registration to be valid for multiple works listed as a "single unit of publication," the works must

have been published together for the first time as a single unit.  McLaren, 2010 WL 4615772, at

*3.  Defendants have nevertheless failed to prove by a preponderance of the evidence that the

Disputed Works listed in the certificates of registration at Plaintiff's Exhibits M and O were not properly registered.

17.  It is true that defendants' post-trial submissions have pointed to some evidence in the record suggesting that five of the seven Disputed Works were separately and individually published before being published as part of the "single unit of publication" identified in their certificates of registration.  The evidence consists solely of publication dates listed in Schedule A to the Subpublishing Agreement and, as to one song, the KOMCA records.

18.  The certificate of registration listing "Ni Kka Jit Ge," "Ga Sik Geol," "So Cool," and "Push Push" identifies the "Title of Work" as "SISTAR NO.1 SO COOL," with a 2010 "Year of Completion" and August 9, 2011 as "Date of 1st Publication."  (PX M.)  Schedule A of the Subpublisher Agreement between Elohim Korea and Elohim lists a variety of publication dates for the songs included on the certificate of registration filed at Plaintiff's Exhibit M.  (See PX A.)  The publication date of "So Cool" is listed as August 9, 2011.  (Id.)  The publication date of "Push Push" is listed as June 3, 2010.  (Id.)  The publication date of "Ni Kka Jit Ge" is listed as November 23, 2010.  (Id. at 16.)  KOMCA records state that "Ga Sik Geol" (identified there as "Ga Sig Geol") has a date of publication of August 26, 2010.  (DX 15 at 8.)

19.  The certificate of registration listing "Bae A Pa" identifies the "Title of Work" as "TEENTOP_No1_repackage special edition," with a 2012 "Year of Completion" and April 25, 2013 as "Date of 1st Publication."  (PX O.)  The certificate of registration lists an effective date of December 19, 2013.  (PX O.)  There is some evidence that at least four of the ten songs listed in the certificate of publication were published prior to April 25, 2013.  The Subpublisher Agreement lists a publication date of February 28, 2013 for "Gin Saeng Meo Ri

Geu Nyeo" and "Sa Rang Ha Go Sip Eo,"  (PX A at 15, 17.)  It lists a publication date of April 29, 2013 for the Disputed Work "Bae A Pa" and "Gil Eul Geot Da Ga (Walk By)." (PX A at 17, 15.)[11]

20.  The evidence of these works' separate publication dates is thin. Defendants have not identified how, when or where the compositions were previously published. They have not introduced evidence of the works' earlier physical or digital publication.  No witness testified about their prior publication.  There is no evidence as to the source of the dates listed in Schedule A or the KOMCA records.  Defendants did not develop evidence about the publication dates at trial or elicit witness testimony as to the same.  Defendants had the opportunity in discovery and at trial to develop a more complete record about the works' dates of first publication but did not do so.  Standing alone, without any context or supporting evidence, the dates listed in Schedule A of the Songwriter Agreement and the KOMCA records do not defeat the presumption of validity by a preponderance of the evidence.

21.  By way of comparison, in <u>McLaren</u>, plaintiff's own pleading annexed evidence showing that it had published certain drawings two years before obtaining a "single unit" registration.  2010 WL 4615772, at *2.  In <u>Senisi</u>, the plaintiff acknowledge in a deposition that one or more works had been published prior to being published as part of a "single unit." 2015 WL 7736545, at *3.  In <u>Unicolors</u>, "the undisputed evidence adduced at trial" showed that at least nine works had been published prior to inclusion in a single unit registration.  959 F.3d at 1198.  The defendants in this case have not offered comparable evidence to successfully rebut the presumption of validity.

---

[11] The other six sings listed on the certificate filed at Exhibit O do not appear to be listed in Schedule A to the Subpublisher Agreement.

22.   Separately, the Court concludes that performing karaoke in the defendant establishments is a public performance under the Copyright Act.

23.   "Under the Copyright Act, the owner of a copyright has the exclusive right publicly to perform and display the copyrighted material." Nat'l Football League v. PrimeTime 24 Joint Venture, 211 F.3d 10, 11 (2d Cir. 2000). The Copyright Act states that "[t]o 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process . . . ." 17 U.S.C. § 101. "To perform or display a work 'publicly' means – (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered . . . ." Id.[12]

24.   "[P]erformances include television broadcasts of [songs] as captured in movies and television programs and radio broadcasts of [songs] as captured in sound recordings." Woods v. Bourne Co., 60 F.3d 978, 983 (2d Cir. 1995). Courts have broadly concluded that a copyrighted work has been publicly performed when it is played in a business establishment open to the public. See, e.g., Broadcast Music, Inc. v. Jeep Sales & Serv. Co., 747 F. Supp. 1190, 1192-93 (E.D. Va. 1990) (it was "undoubtedly a 'public performance' within the scope of the Copyright Act" for an auto dealership to play 17 songs over the business's loudspeakers); see also Broadcast Music, Inc. v. Claire's Boutiques, Inc., 949 F.2d 1482, 1486-88 (7th Cir. 1991) (it was public performance to play copyrighted songs over retail store speakers). Even if a business is classified as a private club under state law, the playing of copyrighted music will constitute a public performance if the club is a place where a substantial

---

[12] The second clause of the definition relates to the transmission of a performance and is not at issue in this case.

number of persons outside of a normal circle of a family and social acquaintances may gather.
See Ackee Music, Inc. v. Williams, 650 F. Supp. 653, 655-56 (D. Kan. 1986).

       25.   In Broadcast Music, Inc. v. Georgia Rib Co., Inc., 166 F. Supp. 3d 1329,
1332 (N.D. Ga. 2014), "a charity/CD release party" was held in the back room of a restaurant
open to the public.  The restaurant did not have its own sound system, and the host of the party
arranged for his own system in the back room, where he played at least five copyrighted songs
without a license.  Id.  The court concluded on summary judgment that the defendant restaurant
was liable for the public performance of the copyrighted songs.  Id.  The record contained
evidence that the songs were played loudly enough to be recorded by investigators, the restaurant
was "a place open to the public on the night in question," and neither the restaurant as a whole
nor the back-room party was limited to a circle of family and social acquaintances.  Id.

       26.   The Seventh Circuit has held that making videos available for view in
private booths constitutes a public performance if the business establishment is open to members
of the public, describing it as "generally accepted and unexceptional law on this subject."  Video
Views, Inc. v. Studio 21, Ltd., 925 F.2d 1010, 1019 (7th Cir. 1991), abrogated on other grounds
by Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994).  "[T]he proper inquiry is directed to the nature
of the place in which the private video booths are located, and whether it is a place where the
public is openly invited."  Id. at 1020.

       27.   Courts have concluded that copyrighted videos are not publicly performed
if they are viewed in the hotel room of a paying guest.  "The movies are viewed exclusively in
guest rooms, places where individuals enjoy a substantial degree of privacy, not unlike their own
homes."  Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc., 866 F.2d 278, 281 (9th Cir.
1989).  A hotel provides "living accommodations and general hotel services," which may include

the rental of videos for viewing in guest rooms.  See id.  While a hotel may broadly be open to members of the public, a guest's room is not.  Id.; see also On Command Video Corp. v. Columbia Pictures Indus., 777 F. Supp. 787, 789 (N.D. Cal. 1991) ("Since hotel guest rooms are indisputably not public places for copyright purposes, On Command's system results in no public performances under the public place clause."); cf. Claire's Boutiques, 949 F.2d at 1486 ("[A] rendition of a copyrighted song in the shower is not a public performance . . . .") (in dictum).

28.  The trial record comfortably demonstrates that the performance of karaoke at defendants' establishments are public performances under the Copyright Act.  As the Court previously found, there is no meaningful difference in how the defendants' businesses operate.  All of the establishments are open to the public and hold themselves out as places to perform karaoke.  An employee assigns customers to a private room.  Customers generally pay an hourly rate, though some establishments charge a flat fee or require a minimum payment amount.  Customers order food and drinks from employees who freely enter and exit the rooms.

29.  Unlike hotel room customers, there is no evidence that karaoke customers had privacy expectations or engaged in activities comparable to those carried out in the home.  In the Joint Stipulation of Facts, defendants state that the individual rooms do not have beds or restrooms, and that customers do not spend the night.  (ECF 352.)  There is no evidence that the rooms could be locked.  Two defendants described windows in the doors that gave limited visibility into the rooms.  (Tr. 130 ("there is a small window that is there, and in the door, they're blinking lights that are reflecting.  That's how we figure out whether someone's singing or not."); 159 ("And there is a window there in the door, and also they order waters -- I mean, not

water.  So the waiters go back and forth to meet the orders, and they ask, are you guys singing.").
Any privacy afforded during the use of a karaoke room was superficial.

         30.  Paragraph 36 in each testimonial declaration submitted by the individual
defendants states that the karaoke rooms are rented "for a gathering of one's family members or
social acquaintances."  (ECF 321-335.)  The identical statement seems to have been copied and
pasted into each witness declaration.  And even if the statement reflects an accurate
understanding of defendants' customers, defendants' businesses still remain open to members of
the public, and not limited to acquaintances and family members.  There is no suggestion that
any defendant had knowledge about the social relationships between their customers.  Nor did
the owners require any representation or proof by the customer that there was a bona fide pre-
existing relationship with a co-occupant of a room.  One witness confirmed in cross-examination
that customers were not limited to groups of family members or social acquaintances.  (Tr. 103.)

         31.  Several non-binding decisions have similarly concluded that karaoke
performances constitute a public performance even if carried out in a private karaoke room.  See,
e.g., Lee v. 162 D&Y Corp., 2023 WL 199288, at *6 (E.D.N.Y. Jan. 17, 2023) (collecting cases);
Beom Su Lee v. Karaoke City, 2019 WL 2451430, at *6 (S.D.N.Y. Apr. 22, 2019) (complaint
plausibly alleged that "despite the fact that there are private rooms within the karaoke venues, the
karaoke bars and clubs themselves are open to the public and, thus, are 'public' places."), R&R
adopted, 2020 WL 5105176 (S.D.N.Y. Aug. 31, 2020); Lee v. eBay, 2018 WL 1941974, at *2
(C.D. Cal. Feb. 8, 2018) ("Caselaw is clear that karaoke constitutes a public performance."),
aff'd sub nom. Lee v. Rosen Music Studio, 776 Fed. App'x 435 (9th Cir. 2019).

         32.  Based on its Findings of Facts, the Court concludes that karaoke was
publicly performed in all of the defendant karaoke establishments.

33.  A party that displays copyrighted song lyrics without obtaining a license or permission from the copyright holder violates the display rights established under 17 U.S.C. § 106(5).  See ABKCO Music, Inc. v. Stellar Recs., Inc., 96 F.3d 60, 64 (2d Cir. 1996) ("Song lyrics enjoy independent copyright protection as 'literary works,' and the right to print a song's lyrics is exclusively that of the copyright holder under 17 U.S.C. § 106(1)."), abrogated on other grounds, eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).  The Park, Hwang and Yoo Declarations annex photographs showing Korean-language lyrics in the Disputed Works displayed on video screens at the defendants' establishments.  The Court concludes that such lyrics were publicly displayed in the defendants' establishments and therefore infringed Elohim's display rights.

34.  The Court therefore concludes that Elohim has proved by a preponderance of the evidence that the defendants are liable for the direct infringement of Elohim's performance rights and display rights over the Disputed Works.  See Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) ("To establish infringement of copyright, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in § 106.") (internal citation and quotation marks omitted).

35.  Elohim separately asserts that defendants are secondarily liable for acts of contributory infringement, vicarious infringement and inducing copyright infringement.  (See Pl. Prop. Findings of Fact. ¶¶ 67-74.)  Elohim does not make a meaningful attempt to connect evidence in the trial record to the varying standards for these three separate grounds for secondary liability, each of which has defined degrees of knowledge and participation on the part

of a defendant.  See generally Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 & n.9, 937 (2005); Arista, 604 F.3d at 117-18.

36.   The Court concludes that Elohim has not proved contributory infringement against any defendant.  The Second Circuit has explained:  "[A]lthough the Copyright Act does not expressly render anyone liable for infringement committed by another, it is well established, based on the common-law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor, that one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.  The knowledge standard is an objective one; contributory infringement liability is imposed on persons who know or have reason to know of the direct infringement."  Arista, 604 F.3d at 117-18 (citations, alterations, emphasis and quotation marks omitted).  "'Participation sufficient to establish a claim of contributory infringement may not consist of merely providing the 'means to accomplish an infringing activity.'"  Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 206 F. Supp. 3d 869, 898 (S.D.N.Y. 2016) (Koeltl, J.) (quoting Livnat v. Lavi, 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998) (Sweet, J.)).  "Evidence of actual and constructive knowledge may be found in cease-and-desist letters, officer and employee statements, promotional materials, and industry experience."  Smith v. BarnesandNoble.com, LLC, 143 F. Supp. 3d 115, 124 (S.D.N.Y. 2015) (Carter, J.) (quotation marks omitted).

37.   Elohim has not proved any defendant's actual or constructive knowledge of infringement.  As noted in the Findings of Fact, the four cease-and-desist letters sent by Elohim and its outside counsel did not identify any specific acts of infringement on the part of any defendant, and generically referenced Elohim's claimed copyrights in thousands of songs.  A

recipient of such letters would have little reason to credit the letters' assertions or know what corrective steps were being demanded.  Elohim's proposed findings also suggest that it seeks to hold a defendant liable as a contributor to that defendant's own primary violations.  (See Pl. Prop. Findings ¶ 68.)  In any event, it is unclear whether Elohim is proposing that all defendants contributed to primary acts of infringement, or instead whether it contends that one subset of defendants contributed to the infringing activities of a different set of defendants.  (See id. at ¶¶ 67-68.)

38.  Elohim has proved by a preponderance of the evidence that the individual defendants are vicariously liable for any infringing activity that occurred at the defendant establishments.  A person "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."  Metro-Goldwyn-Mayer, 545 U.S. at 930. "Vicarious liability for copyright infringement may arise only when the defendant had the right and ability to supervise that coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials.  An increase in . . . customers due to copyright infringement qualifies as an obvious and direct financial interest."  EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 99 (2d Cir. 2016) (quotation marks and internal citations omitted).  A defendant may be vicariously liable for copyright infringement "even though he has no actual knowledge that copyright monopoly is being impaired."  Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971); Premier Fabrics, Inc. v. Woodland Trading Inc., 42 F. Supp. 3d 549, 555 (S.D.N.Y. 2014) (knowledge not required to be vicariously liable for copyright infringement) (Kaplan, J.).

39.  The uncontested facts set forth in the Joint Pretrial Order provided that each individual defendant "is responsible for the overall operation" of his or her karaoke

establishment, including compliance with any licensing requirements.  (JPTO at 5-7.)  The Court concludes that it is more likely than not that each individual defendant had a financial interest in the exploitation of the Disputed Works and did not exercise his or her authority to stop or limit infringing activities.

      40.  Elohim has not proved that defendants induced acts of copyright infringement.  A defendant may be liable for inducing copyright infringement when it engages in "purposeful, culpable expression and conduct . . . ."  Metro-Goldwyn-Mayer, 545 U.S. at 937.  This may include "[e]vidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged . . . ."  Id. at 936 (internal citation and quotation marks omitted).  Elohim has not proved that defendants had an affirmative intent to infringe Elohim's copyrights or encouraged its customers to engage in infringing conduct.

      41.  Elohim seeks statutory damages.  It urges that defendants willfully infringed the copyrights in the disputed works.  Accordingly, it seeks the maximum available statutory damages of $150,000 from each defendant for each Disputed Work that was performed and displayed at the defendant establishments.

      42.  "[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action . . . ."  17 U.S.C. § 504(c)(1).  Damages shall be "in a sum of not less than $750 or more than $30,000 as the court considers just."  Id.

      43. "Awards of statutory damages serve two purposes—compensatory and punitive."  Fitzgerald Pub. Co. v. Baylor Pub. Co., 807 F.2d 1110, 1117 (2d Cir. 1986).  "When

determining the amount of statutory damages to award for copyright infringement, courts

consider: (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the

infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer

and third parties; (5) the infringer's cooperation in providing evidence concerning the value of

the infringing material; and (6) the conduct and attitude of the parties." Bryant v. Media Right

Prods., Inc., 603 F.3d 135, 144 (2d Cir. 2010). "Unlike actual damages, statutory damages do

not require the precise monetary quantification of injury." Castillo v. G&M Realty L.P., 950

F.3d 155, 172 (2d Cir. 2020). "Cases where high statutory damages are awarded typically

involve defendants who profit significantly despite repeated notices that they are infringing on

the plaintiff's copyright." Myeress v. Elite Travel Grp. USA, 2018 WL 5961424, at *3

(S.D.N.Y. Nov. 14, 2018) (Nathan, J.).

      44.  "In a case where the copyright owner sustains the burden of proving, and

the court finds, that infringement was committed willfully, the court in its discretion may

increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. §

504(c)(2). "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the

defendant was actually aware of the infringing activity, or (2) that the defendant's actions were

the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."

Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005).

"[E]ven in the absence of evidence establishing the infringer's actual knowledge of infringement,

a plaintiff can still prove willfulness by proffering circumstantial evidence that gives rise to an

inference of willful conduct." Id. at 264.

      45.  Several factors weigh against a finding of willfulness.  Elohim places

great weight on the cease-and-desist letters that it sent in 2017 and 2018.  As has been discussed,

those boilerplate letters did not give meaningful notice of any purported acts of infringement. The letters claimed that Elohim had the exclusive rights to 17,000 Korean-language songs but gave the recipients no guidance as to what works they may have infringed.  One letter discouraged its recipients against following the advice of counsel.  Even after Elohim had arranged for its employees or agents to visit the defendant establishments and publicly perform and display Elohim's copyrighted works, the subsequent letters did not identify any infringed works.  A recipient of these letters would have no basis to know whether they were a good-faith demand for a licensing fee or a baseless effort to extract payment under threat of litigation.

46.  There is no suggestion in the record that any defendant intentionally or knowingly infringed Elohim's display or performance rights in the Disputed Works.  Defendants did not select the Disputed Works for inclusion in their catalogs of available songs.  Instead, TJ Media automatically updated its machines to add new songs on an ongoing basis.  The seven Disputed Works were among the many thousand songs included in the TJ Media karaoke machines.  There is also no indication that any defendant touted the availability of the Disputed Works at their establishments or was even aware that they were among the thousands of songs on the TJ Media machines.

47.  Some individual defendants testified that they had licensing arrangements with ASCAP and BMI.  There is no evidence as to what licensing responsibility, if any, TJ Media has for obtaining licenses for the works that it loads into its karaoke machines.  One witness testified that he believed that the songs had been licensed through the TJ Media machines.  (Tr. 106-07.)

48.  Defendants Flower Karaoke, Happy Karaoke, Open Karaoke, Christmas Karaoke, Sagwa Namoo and CEO Business Club were previously sued for copyright

infringement in <u>Lee v. 162 D & Y Corp. d/b/a Flower Karaoke</u>, <u>et al.</u>, 18 Civ. 2580 (E.D.N.Y.) (BMC) (PK).  The claims against Christmas Karaoke, Happy Karaoke and Sagwa Namoo were voluntarily dismissed with prejudice.[13]  (<u>Id.</u> ECF 37, 98, 110.)  Default judgment was entered against Flower Karaoke, Open Karaoke and CEO Business Club.  (<u>Id.</u> ECF 123.)  Gagopa Karaoke and Wow Karaoke were previously sued for copyright infringement in <u>Lee v. Karaoke City</u>, <u>et al.</u>, 18 Civ. 3895 (PAE) (SDA), and entered into a stipulation of voluntary dismissal on March 5, 2021 (<u>id.</u> ECF 182).  Both actions were brought <u>pro se</u> by the copyright holder and heir of a Korean composer described as "the Schubert of Korean Kayo," whose compositions had been loaded into a TJ Media machine at defendant establishments.  Elohim argues that these prior litigations are evidence that defendants are "repeat offender[s]" with a "cavalier attitude" toward infringement.  (Pl. Prop. Findings ¶ 77.)  But they are also reflective of a piecemeal approach to rights-management in the United States performance rights of Korean-language compositions, and what appears to be an arrangement in which TJ Media's song placements put karaoke establishments at an ongoing risk of infringing copyright holders' performance and display rights.  This does not excuse defendants' acts of infringement and the evident lack of care in securing the licensing rights for all works made available in their establishments, but the existence of two prior actions brought against some defendants also does not nudge Elohim over the line in proving that defendants' infringing activities were willful.

       49.  Elohim does not address the six factors that guide an award of statutory damages as set forth in <u>Bryant</u>, 603 F.3d at 144.

       50.  On the infringer's state of mind, as noted, there has been no showing that any defendant intentionally infringed the performance and display rights for the Disputed Works,

---

[13] Elohim incorrectly states that default judgment was entered against all defendants.  (Pl. Prop. Findings ¶ 77.)

or even knew that the works were available on their karaoke machines.  The evidence is consistent with a failure to scrutinize the song selections uploaded by TJ Media and any corresponding licensing obligations.  This state of mind is broadly consistent with negligence toward licensing obligations and not willfulness or knowledge.

51.  There is little evidence of any infringer's expenses saved and profits earned, or of the revenue lost by Elohim as the copyright holder.  There is no evidence whether the seven Disputed Works are widely popular, well-known songs that are frequently performed at karaoke and would tend to draw customers to defendants' establishments, thereby making them conspicuously profitable.  It is possible that the Disputed Works are performed daily by multiple customers, but also possible that Elohim's agents and employees were the only, or, at least, among the few customers to perform the works at defendants' establishments.  On Elohim's lost profits, Cha testified that he has "come up with my own price" for monthly licenses, which varies based on whether businesses have a full liquor license or just a license to serve beer and wine.  (Tr. 311-12.)  Cha testified that his licensing fees "all depends on the locations," and that he would charge less "if this karaoke located in suburb of Los Angeles, which doesn't draw that many Korean customers" but would charge more "where there's karaoke bars located in right in heart of Koreatown . . . ."[14]  (Tr. 312.)  He testified that he typically charges a monthly license of between $30 and $50 per karaoke room.  (Tr. 311-12.)

52.  There is a strong value in deterring the defendants and others similarly situated from the infringement of performance and display rights at a karaoke establishment, and in incentivizing such entities to scrutinize their catalogs of available songs and follow best practices for licensing.

---

[14] He did not testify about factors that guide his calculation of licensing fees in New York City.

53.  As to defendants' cooperation and the parties' conduct and attitude, this factor is neutral.  This case was reassigned to the undersigned in April 2022, following the close of fact discovery.  It had been referred to Magistrate Judge Aaron for general pretrial supervision.  This is a hard-fought litigation between sophisticated counsel that was brought against a large number of defendants.  Certain defendants have defaulted, but those who proceeded to trial strongly contested Elohim's claims.  The Court is unaware of any conduct that weighs in favor of the high end of the scale for statutory damages.

54.  The Court separately notes that Elohim does not urge that there are relevant differences between the defendant karaoke establishments that should be taken into account when deciding a damages award against any individual defendant.  It does not differentiate between the defendants based on their customer capacities or hourly rates charged, and does not urge that there are any differences between the many defendants on the issue of knowledge and intent.

55.  Statutory damages are awarded "with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally . . . ."  17 U.S.C. § 504(c)(1).  "District courts enjoy wide discretion in setting statutory damages."  Castillo, 950 F.3d at 171.  Damages are awarded against a defendant "per work" infringed.  Id. at 164; accord Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 107 (2d Cir. 2001); Stokes v. MilkChocolateNYC LLC, 2023 WL 4447073, at *7 (S.D.N.Y. July 11, 2023) (Engelmayer, J.).

56.  The Court will award statutory damages to Elohim in the amount of $3,500 per work infringed, to be awarded jointly and severally against each defendant karaoke establishment and each individual defendant sued in his or her capacity as that establishment's

owner.  The award reflects the important need for deterrence against the defendants' infringing activities and the need to deter others similarly situated.  It also takes into account the evidence of defendants' states of mind, as well as the lack of evidence for defendants' economic benefits as a result of their infringing activities and any lost payments owed to Elohim for the unlicensed performance of the Disputed Works.  It weighs Cha's testimony that Elohim would typically charge a licensee between $30 and $50 per month per karaoke machine based on the establishment's location and whether it had obtained a liquor license, though this testimony is of limited value without guidance from Elohim as to the licensing fees it would likely charge to the defendants in this case.  (Of course, statutory damages may far exceed a customary licensing fee.)  Aside from seeking the maximum available award of $150,000 against each defendant based on claimed acts of willful infringement, Elohim has not set forth its views on how the Court should arrive upon a damages figure.  The Court concludes that damages in the amount of $3,500 per infringed work is sufficient to advance the goals of deterrence and compensation without providing Elohim with an undue windfall.

57.   There remains the issue of determining what constitutes "one work" for the purpose of awarding statutory damages under the Copyright Act.

58.   The songs "Ni Kka Jit Ge," "Ga Sik Geol," "So Cool" and "Push Push" were registered as a "single work" in the form of an album.  The Copyright Act allows for statutory damages "with respect to any one work . . . ."  17 U.S.C. § 504(c)(1).  The Second Circuit's <u>Bryant</u> decision concluded that where a copyright holder registered a compilation[15] of

---

[15] "Compilation" is a defined term under the Copyright Act.  17 USC § 101 ("A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.").  Elohim has not urged that it submitted any copyright registration as a "compilation."

works as a single album, the "infringement of an album should result in only one statutory

damage award.  The fact that each song may have received a separate copyright is irrelevant to

this analysis."  603 F.3d at 141.  The analysis is "focused on whether the plaintiff—the copyright

holder—issued its works separately, or together as a unit."  Id.

59.  Bryant expressly rejected a test used in other circuits that looks to

whether each song has "independent economic value."  Id. at 141-42.  "The Act specifically

states that all parts of a compilation must be treated as one work for the purpose of calculating

statutory damages.  This language provides no exception for a part of a compilation that has

independent economic value, and the Court will not create such an exception."  Id. at 142.

60.  The conclusion that a "single unit of publication" constitutes "one work"

for the purpose of awarding statutory damages is supported by the relevant regulatory text.  As

operative in 2013, section 202.3(b)(4) governed "[r]egistration as a single work" and defined the

criteria for an application that "shall be considered a single work."  37 C.F.R. § 202.3(b)(4)(i)

(effective July 18, 2013).  The regulation has since been amended to govern "[r]egistration as

one work" and defined the criteria for an application that "shall be considered one work . . . ."

37 C.F.R. § 202.3(b)(4)(i) (effective Oct. 31, 2022).

61.  In Arista Records LLC v. Lime Group LLC, 2011 WL 1311771, at *3

(S.D.N.Y. Apr. 4, 2011), Judge Wood concluded that a plaintiff could recover separate awards of

statutory damages for each individual album track that was unlawfully infringed.  She stated that

"it appears that many (if not most) of Plaintiffs' sound recordings were issued and infringed on

an individual basis.  The fact that those sound recordings were also compiled as parts of albums

does not alter this fact."  Id. at *4.  She explained that in Bryant, an album "was the only form in

which plaintiffs had <u>ever</u> issued their sound recordings," in contrast to the individual releases of songs at issue in <u>Arista</u>. <u>Id.</u> at *3-4.

62. Here, however, Elohim has not submitted evidence as to whether and how any of the four songs received separate individual releases, and has instead characterized them as "a single unit of publication" that "make up part of a CD/album." (<u>See</u>, <u>e.g.</u>, ECF 367.)

63. Elohim does not discuss <u>Bryant</u> or <u>Arista</u> and relies on Ninth Circuit authority that permits individual damages awards when works within a database have "independent economic value." <u>See</u> <u>VHT, Inc. v. Zillow Grp., Inc.</u>, 69 F.4th 983, 990 (9th Cir. 2023). This is the precise approach that <u>Bryant</u> declined to adopt. <u>See</u> 603 F.3d at 142 ("This Court has never adopted the independent economic value test, and we decline to do so in this case."); <u>see also</u> <u>Conan Properties Int'l LLC v. Sanchez</u>, 2018 WL 4522099, at *30 (E.D.N.Y. June 8, 2018) (describing the "independent economic value" analysis as a "discredited test" with "a tendency to lead to absurd results . . . ."), <u>R&R adopted</u>, 2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018) (Block, J.).

64. The record in this case requires "Ni Kka Jit Ge," "Ga Sik Geol," "So Cool" and "Push Push" to be treated as "one work" for the purpose of awarding statutory damages. Statutory damages will therefore be awarded once for the infringing use of any of the four songs. Separate statutory damages will be awarded for the infringing use of each of "Bae A Pa," "Hot Boy," and "Sal Man Jji Go."

65. To the extent Elohim seeks a separate award of statutory damages against any individual defendant on grounds of vicarious infringement, such an application is denied. Elohim has urged that all defendants are liable for direct infringement. An additional award

against the individual defendants on the basis of their vicarious infringement would amount to double recovery.

66.   The Court awards damages as follows:

a.      162 D & Y Corp. d/b/a Flower Karaoke and Dong Hyun Ha are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Ga Sik Geol" and "Bae A Pa."

b.      Y & P Bayside Corp. d/b/a Happy Karaoke and Phil Sook Cho are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Bae A Pa," and the songs "So Cool" and "Ga Sik Geol," the latter two songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

c.      Musicbox KTV, Inc. d/b/a Music Box K-TV and Anthony Kim are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Bae A Pa," and the songs "So Cool," "Push Push" and "Ni Kka Jit Ge," the latter three songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

d.      SS Noblesse House, Inc. d/b/a SS Noblesse House and Yinhua Huang are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Bae A Pa" and the songs "Ga Sik Geol" and "Push Push," the latter two songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

e.      Place of Happy and Lucky d/b/a The King Karaoke is liable for $7,000 in damages for the infringement of "Sal Man Jji Go," and the songs "Push Push, "Ni Kka Jit Ge" and "Ga Sik Geol," the latter three songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

       f.     YS2 Enterprises, Inc. d/b/a CEO Business Club and Hyun Hak Yi are jointly and severally liable for $3,500 in damages for the infringement of "Ga Sik Geol."

       g.     Sagwa Namoo, Inc. d/b/a Sagwa Namoo and Kyung Soon Nam are jointly and severally liable for $3,500 in damages for the infringement of "Hot Boy."

       h.     Base Karaoke, Inc. d/b/a K-2 Karaoke f/k/a Base Karaoke and Dong Hun Kim are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Bae A Pa," and the songs "So Cool," "Push Push" and "Ga Sik Geol," the latter three songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

       i.     Open Karaoke Corp. d/b/a Yulrin Karaoke a/k/a Open Karaoke and Ku Ho You are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Bae A Pa" and the songs "Ni Kka Jit Ge" and "Ga Sik Geol," the latter two songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

       j.     Sing Sing Bell, Inc. d/b/a Christmas Karaoke and Jin E. An are jointly and severally liable for $10,500 in damages for the infringement of "So Cool," "Sal Man Jji Go" and "Bae A Pa."

       k.     Bizmax NY, Inc. d/b/a Wow Karaoke and Ki Beom Kim are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji Go," "Bae A Pa," and the songs "So Cool," "Push Push" and "Ni Kka Jit Ge," the latter three songs constituting one work for the purposes of awarding statutory damages under the Copyright Act.

       l.     M & S Music Studio, Inc. d/b/a Gagopa Karaoke and Hye Kyung Han are jointly and severally liable for $10,500 in damages for the infringement of "Sal Man Jji

Go," "Bae A Pa," "Hot Boy," and the songs "Push Push" and "Ga Sik Geol," the latter two songs

constituting one work for the purposes of awarding statutory damages under the Copyright Act.

67. Elohim's pre-trial memorandum urged that the Court should issue

permanent injunctive relief, award attorneys' fees, and enter an Order directing the impoundment

and destruction of defendants' karaoke machines. Its Proposed Findings of Fact and Conclusions

of Law include no such proposed relief, and any request for such relief is deemed abandoned.

68. To the extent that either party has raised an argument that is not expressly

addressed in these Findings of Fact and Conclusions of Law, all such arguments have been

considered by the Court.

CONCLUSION

Judgment will be entered for the plaintiff on its claim of direct copyright

infringement as to all defendants and its claim of vicarious infringement as to the individual

defendants. Statutory damages will be awarded jointly and severally as follows: $10,500 against

162 D & Y Corp. d/b/a Flower Karaoke and Dong Hyun Ha; $10,500 against Y & P Bayside

Corp. d/b/a Happy Karaoke and Phil Sook Cho; $10,500 against Musicbox KTV, Inc. d/b/a

Music Box K-TV and Anthony Kim; $10,500 against SS Noblesse House, Inc. d/b/a SS

Noblesse House and Yinhua Huang; $7,000 against Place of Happy and Lucky d/b/a The King

Karaoke; $3,500 against YS2 Enterprises, Inc. d/b/a CEO Business Club and Hyun Hak Yi;

$3,500 against Sagwa Namoo, Inc. d/b/a Sagwa Namoo and Kyung Soon Nam; $10,500 against

Karaoke, Inc. d/b/a K-2 Karaoke f/k/a Base Karaoke and Dong Hun Kim; $10,500 against Open

Karaoke Corp. d/b/a Yulrin Karaoke a/k/a Open Karaoke and Ku Ho You; $10,500 against Sing

Sing Bell, Inc. d/b/a Christmas Karaoke and Jin E. An; $10,500 against Bizmax NY, Inc. d/b/a

Wow Karaoke and Ki Beom Kim; and $10,500 against M & S Music Studio, Inc. d/b/a Gagopa Karaoke and Hye Kyung Han.

All claims against Gunha Song are deemed abandoned and therefore are dismissed.

No later than December 29, 2023, plaintiff shall file a Proposed Final Judgment consistent with these Findings of Fact and Conclusions of Law.  Defendants may file a response no later than January 5, 2024.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
         December 18, 2023

- 51 -